IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| | | |
|---|---|---|
| AMANDA AL-SAWAI, | § | |
|     *Plaintiff* | § | CIVIL ACTION NO.  *7:22-cv-00261* |
| | § | |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| UNIVERSITY OF TEXAS, | § | |
| PERMIAN BASIN; WAYNE COUNTS, | § | |
| *individual capacity;* & STEVEN BEACH, | § | |
| *individual capacity* | § | |
| *Defendant* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COMES Plaintiff, Amanda Al-Sawai, and files this, her Original Complaint and Jury Demand against University of Texas, Permian Basin, Wayne Counts, *individually*, and Steven Beach, *individually* (hereinafter as "Defendants" or "UTPB *et al*"). In support thereof, Plaintiff respectfully shows the following:

**I.
PARTIES**

1. Plaintiff, Amanda Al-Sawai (hereinafter as "Plaintiff" or "Al-Sawai") is a citizen of the State of Texas, and at all times relevant, resided in the County of Ector.

2. Defendant University of Texas, Permian Basin is a state agency duly organized under the laws of the State of Texas. UTPB can be served with process by serving its current President, Dr. Sandra Woodley, at 4901 E. University Blvd., Odessa, Texas 79762.  In the *alternative*, UTPB may be served by and through its office of General Counsel, Ana Vieira Ayala, 210 West 7th Street, Austin, Texas 78701.

3. Defendants Counts and Beach are employees of UTPB, are believed to also reside in Ector County, Texas, and may also be served by and through the UTPB Office of General Counsel Ana Vieira Ayala, 210 West 7th Street, Austin, Texas 78701.

## II.
## JURISDICTION AND VENUE

4. This Court has jurisdiction over Mrs. Al-Sawai's claims pursuant to 28 U.S.C. §1331. Federal claims arise under 42 U.S.C. § 2000e *et seq*., hereafter referred to as Title VII.

5. Venue is appropriate in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in the District. Mrs. Al-Sawai was a student and an employee of UTPB, which is in the Western District of Texas. The UTPB campus is in Odessa, Texas – that campus is located within the Western District of Texas, Midland Division.

## III.
## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Plaintiff now brings forth this cause of action timely compliance with her Statutory Notice(s) of Right to Sue, as issued by the relevant government agency, on or about September 20th, 2022 The ninety (90) day deadline would be midnight, December 19th, 2022. Hence this cause of action is timely filed. Pursuant to EEOC Charge No. 460-2022-04967, Plaintiff's causes of action stem from **Title VII** of the Civil Rights Act of 1964, as amended, 42 USC §2000e, *et seq*, reflecting gender and religious discrimination. As the Defendant is believed to have over five hundred (500) employees at all times relevant, the Plaintiff meets the minimum requirements necessary for both of the above claims.

## IV.
## FACTUAL ALLEGATIONS

7. Amanda Al-Sawaii is a Muslim female. Mrs. Al-Sawaii is a United States citizen. At all times relevant, Mrs. Al-Sawaii was both a student, and an employee, of the University of Texas Permian Basin.

8. On or about November 3rd, 2019, Mrs. Al-Sawaii was invited to apply for the Accreditation Specialist at University of Texas Permian Basin hereafter referred to as UTPB.

9. On or about August 20th, 2020, Mrs. Al-Sawaii also applied for the Administrator I position for the MMI department for a higher rate of pay and promise of flexibility to better care for her minor son.

10. Mrs. Al-Sawaii was qualified for her position.

11. Mrs. Al-Sawaii reported to Dr. Steve Beach even though Dr. Beach was not her direct supervisor.

12. Mrs. Al-Sawaii directly reported to Dr. Joseph Stauffer for her position: Administrator I.

13. Mrs. Al-Sawaii directly reported to Dr. Wayne Counts for her position as Accreditation Specialist. These two positions gave her direct access to deep level University information.

14. Of note, Mrs. Al-Sawaii was, at all times relevant, also a student at UTPB.

15. On or about November of 2020, Mrs. Al-Sawaii was informed by Dr. Beach and Dr. Gormus that all Finance and Economic's students would be moved to Dr. Gormus for advising. The purpose of this was to solicit the low course grade and low GPA students within Dr. Paul Haensly and Dr. Scott Carson's classes and have those students file formal complaints against their professors with Dr. Gormus. These complaints would have allowed UTPB to terminate Dr. Haensly and Dr. Carson for cause, *if* substantiated.

16. On or about January 15th, 2021, Mrs. Al-Sawaii was informed by Dr. Gormus that Dr. Beach, himself and a few other unknown faculty and staff attended a conference call with the UTPB system to terminate the employment of Dr. Carson. Dr. Beach also stated that the program would be revived after the successful termination of Dr. Carson.

17. On or about February 2021, Dr. Beach and Dr. Gormus stated that Dr. Carson's program

was closed, and Dr. Carson would be terminated. Mrs. Al-Sawaii did not report to compliance because Mrs. Narita Homes has a close relationship with Dr. Beach.

18. On or about February of 2021, Ron Appling, University Human Resources, stopped by Mrs. Al-Sawaii's office to speak to her regarding some issues. After this meeting, Mrs. Al-Sawaii noticed that Mr. Appling's behavior changed towards her.

19. On or about March of 2021, Mrs. Al-Sawaii verbally reported the solicitation of students to complain about Dr. Haensly to Ron Appling.

20. On or about March of 2021, Mrs. Al-Sawaii became the target of large amounts of hostility, bullying and was reprimanded often for minor issues.

21. On or about March of 2021, Mrs. Al-Sawaii asked Mr. Appling for advice regarding the hostility and bullying she was experiencing at that time.

22. On or about April 2021, Mrs. Al-Sawaii started seeing an increase in the hostility and bullying. She also starts experiencing unkind comments and work interference. Dean Counts noticed the situation with Mrs. Al-Sawaii and spoke to Dr. Beach.

23. On or about April through May of 2021, Mrs. Al-Sawaii verbally complained to Dr. Beach regarding the bullying and hostility she was experiencing.

24. On or about April through August of 2021, Mrs. Al-Sawaii continuously verbally complained to Dr. Counts regarding the bullying and hostility she was experiencing.

25. On or about April 19th, 2021, Mrs. Al-Sawaii was called into compliance regarding a report that was done by two of her coworkers reporting their concern for Mrs. Al-Sawaii's safety.

26. On or about April 19th, 2021, Dr. Gormus informed Dr. Beach that Mrs. Al-Sawaii accused Lili Gai and Kaitlyn Veach of the report made to compliance.

27. On or about April 21st, 2021, Ms. Veach engaged in an altercation in the hallway with Mrs. Al-Sawaii in front of Dr. Fannin and Dr. Wael regarding being accused of making

the report regarding Mrs. Al-Sawaii's safety to compliance.

28. Mrs. Al-Sawaii refused to engage with Ms. Veach. As a result of this altercation with Ms. Veach, Mrs. Al-Sawaii spoke to Dr. Beach regarding the incident. Mrs. Al-Sawaii informed Dr. Beach that she will no longer be able to work overtime.

29. As a result of Mrs. Al-Sawai's complaint regarding Ms. Veach, Dr. Beach indirectly threatened Mrs. Al-Sawaii with termination and assigned Ms. Veach's work to Mrs. Al-Sawaii.

30. At this time, Mr. Beach also stated he would introduce his "Flextime Policy" next week to his staff. The "flextime policy" assigned specific remote hours with no flexibility.

31. Throughout April 2021, Mrs. Al-Sawaii experienced daily reprimands by Dr. Gai. Mrs. Al-Sawaii also reported that Chris Isham was interfering with her work and was being rude to her directly. Mr. Isham and Ms. Veach also start complaining loudly about Mrs. Al-Sawaii walking past her office, often mocking Mrs. Al-Sawaii's accent and statements she previously made.

32. On or about May 2021, Mrs. Al-Sawaii noticed a large amount of her files within Microsfot Teams had been deleted and/or were going 'missing.' Mrs. Al-Sawaii contacted IRD and confirmed that Mr. Isham was actively and intentionally deleting Mrs. Al-Sawaii's files, and that such efforts had escalated to Mr. Isham editing her work product in Sharepoint. Mrs. Al-Sawaii continued to report these issues as she experienced them, to Dr. Counts. No remedial actions were ever taken to her knowledge.

33. On or about May 28th, 2021, Mrs. Al-Sawaii met with Dr. Beach in her office and explained what had been happening with her documents. Mrs. Al-Sawaii explained she spoke to IRD and confirmed Mr. Isham was deleting her documents. Mrs. Al-Sawaii also showed Dr. Beach the activity log for two workbooks that proved what IRD had stated.

34. Dr. Beach accused Mrs. Al-Sawaii of lying regarding the actions of Mr. Isham. Dr. Beach also made outrageous and unsubstantiated accusations towards Mrs. Al-Sawaii and brought up what Dr. Gormus stated regarding the report made to compliance April 19th, 2021.

35. On or about May 30th, 2021, Mrs. Al-Sawaii texted Dr. Gormus and asked if he had made statements to Dr. Beach regarding the report made to compliance April 19th, 2021. Dr. Gormus admitted he did and threatened to accuse Dr. Spurlock if Mrs. Al-Sawaii said anything about such false statements. As a result of this conversation with Dr. Gormus, Mrs. Al-Sawaii dropped his course the first week of June 2021. This was the first instance of false reports and manipulation causing Mrs. Al-Sawaii's status as a student to fall into question – it would not be the last.

36. On or about June 10th, 2021, Dr. Counts handed Mrs. Al-Sawaii a printed paper to read from compliance. It was a complaint that was submitted making an untrue accusation against Mrs. Al-Sawaii.

37. Dr. Counts informed Mrs. Al-Sawaii that Dr. Beach did not want her to know about it.

38. Dr. Counts took the paper after Mrs. Al-Sawaii read it and would not give her a copy for her records. Due to specific language regarding the use of PO1s and the encounters with Dr. Beach and Dr. Gormus, Mrs. Al-Sawaii responded via email to Dr. Beach.

39. Throughout June 2021, Mrs. Al-Sawaii met with Mr. Appling regarding the complaint made against her. Mrs. Al-Sawaii also informs Mr. Appling of the increase in hostility, bullying, being mocked and also now being called names by her coworkers.

40. Throughout August of 2021, Mrs. Al-Sawaii was informed that she was not awarded the College of Business scholarship which is reviewed by Dr. Gai and Mr. Isham. Dr. Peckham informed Mrs. Al-Sawaii he had awarded her the scholarship personally, however Dr. Gai stated that Financial Aid awards *all* scholarships.

41.    Throughout August of 2021, Mrs. Al-Sawaii was frequently threated and physically intimidated by Dr. Gai, Dr. Gormus, Dr. Beach, Ms. Veach and Mr. Isham. Ms. Al-Sawaii reported this behavior to Mr. Appling as she began fearing for her safety.

42.    On or about August 18th, 2021, Mrs. Al-Sawaii came across an email chain that had large amounts of fabricated stories regarding Mrs. Al-Sawaii's work in Dr. Vafei's office. Mr. Isham directly worked on Dr. Vafei's office's needs. Within the email thread, Mrs. Al-Sawaii read an email from Dr. Saran discussing Dr. Gorum's statements regarding Mrs. Al-Sawaii's student records and demanding that the Dean stop Mrs. Al-Sawaii from continuing her education. Dr. Counts allowed Mrs. Al-Sawaii to read the email thread but refused to let Mrs. Al-Sawaii have a copy so she could file a formal complaint. Mrs. Al-Sawaii proceeded to speak to Dr. Beach about the fabricated and threatening email thread she read. Dr. Beach then indirectly threatened Mrs. Al-Sawaii, academically, if she proceeded to complain about the email.

43.    On or about August 24th, 2021, Mrs. Al-Sawaii submitted a written FERPA violation and Academic threat grievance to Mr. Appling.

44.    On or about August 31st, 2021, Mrs. Al-Sawaii began working remotely and immediately began seeing retaliation from her coworkers.

45.    On or about September of 2021, Mrs. Al-Sawaii found out that Mr. Appling was not investigation her complaints, but rather was openly investigating Mrs. Al-Sawaii.

46.    On or about September 28th, 2021, Mr. Appling met with several of Mrs. Al-Sawaii's witnesses, but was unclear as to whether the investigation was regarding Mrs. Al-Sawaii's complaints, or complaints about Mrs. Al-Sawaii.

47.    On or about October 1st, 2021, Mr. Appling's investigation concluded, and all reports were found to be unsubstantiated. Mrs. Al-Sawaii was informed of the outcome and allowed to return to work October 4th, 2021.

48. On or about October 4th, 2021, Mrs. Al- Sawaii took a sick day and did not return to work.  Early that Morning, Dr. Beach sent Mrs. Al-Sawaii and the rest of the college an eamil stating that twenty-one individuals testified on his behalf and intimated that Mrs. Al-Sawaii lied and was to immediately return to work, in person.  Dr. Beach also stated that Mrs. Al-Swaii created a bad culture and attached commentary regarding 'unsubstantiated claims' in order to weaken Mrs. Al-Sawaii's complaints.  Mrs. Al-Sawaii emailed university Human Resources, the Provost, the President of the College, and Compliance regarding the email from Dr. Beach. None of the above bothered to responds her email.

49. On or about October 5th, 2021, Mrs. Al-Sawaii informed Dr. Counts and Mr. Appling that she will be out for the remainder of the week for medical appointments.  While Mrs. Al-Sawaii was out of the office. Dr. Isham notified other departments that Mrs. Al-Sawaii was no longer employed by the university, and sought reassignment of her work, along with training for himself and Ms. Veach.

50. That same day, Dr. Gai informed Lea, Mrs. Al-Sawaii's administrative assistant, that she no longer works for Mrs. Al-Sawaii and will eport to the front offices.  Mrs. Al-Sawaii's accesses to all university programs and files was revoked, and she was removed as co-owner to all of her active work assignments.

51. On or about October 8th, 2021, Mrs. Al-Sawaii submitted an appeal of her FERPA complaint to Mr. Appling and the Dean of Students.

52. Throughout October of 2021, Dr. Beach personally requested changes to Mrs. Al-Sawaii's sharepoint access to IRD.  Mrs. Al-Sawaii also returned to work during this time, only to find that her access to almost all of her documents had been restricted.  Mrs. Al-Sawaii witnessed many of her documents and emails being deleted.  Mrs. Al-Sawaii also witnessed her documents being edited by users other than her.

53. On or about October 21st, 2021, Mrs. Al-Sawaii had lunch with Amanda Sarabia. Ms. Sarabia informed Mrs. Al-Sawaii that while Mrs. Al-Sawaii was out sick earlier in the month, Ms. Sarabia was ordered to sign a Confidentially Agreement regarding the university's unsubstantiated investigation of Mrs. Al-Sawaii.

54. On or about October 22nd 2021, Dr. Counts came into Mrs. Al-Sawaii's office and physically intimidated her, mimicked violence by striking inanimate objects, lunged at Mrs. Al-Sawaii, and attempted to prevent Mrs. Al-Sawaii from leaving her office.

55. Mrs. Al-Sawaii reported the incident to the police and University Compliance. Due to this incident, Mrs. Al-Sawaii immediately started working from home, and was forced to drop several of her courses. Around this time, Mrs. Al-Sawaii also foudmd out that she had been intentionally excluded from vital work meetings that directly affected her job duties and responsbilities. As a direct result of this intentional exclusion, Mrs. Al-Sawaii started receiving poor work performance emails stating that she was under performing.

56. On or about November 12th, 2021, Mrs. Al-Sawaii met with Mr. Fannin, who gave her a letter stating that Mrs. Al-Sawaii was unprofessional, and that there were job performance concerns. Mr. Fannin stated that Mrs. Al-Sawaii was to sign the document confirming these allegations. Mrs. Al-Sawaii refused to sign and was informed that she was to return to work November 15th, 2021.

57. On or about November 15th, 2021, Mrs. Al-Sawaii returned to work and submitted a complaint the Texas Board Of Education and University of Texas System. Mr. Appling also received a copy of these complaints.

58. Throughout December of 2021, Mrs. Al-Sawaii was informed by Dr. Stauffer that Mrs. Al-Sawaii was not allowed to enroll into college courses, *per the Dean's Office*. Mrs. Al-Sawaii needed to take a lower level finance course and asked Dr. Stauffer if she could take a contract study. Dr. Stauffer stated that Mrs. Al-Sawaii could not take *any* courses

at all, and insinuated that Mrs. Al-Sawaii filed complaints against him as well.

59. On or about January of 2022, Dr. Stauffer sent out an email regarding Mrs. Al-Sawaii. Mrs. Al-Sawaii received a copy of this email by a mistake. Dr. Stauffer stated that Mrs. Al-Sawaii was denied the contract study and that he had contacted the Provost about blocking Mrs. Al-Sawaii from all courses. Dr. Stauffer stated he alone does not have the authority to continue to block Mrs. Al-Sawaii from courses, and insinuated that Mrs. Al-Sawaii would continue to file complaints against other members of the staff, if left unchecked.

60. Sometime in February of 2022, Dr. Beach asked for Mrs. Al-Sawaii to return her extra set of keys. Dr. Beach also accused Mrs. Al-Sawaii of having Mr. Isham download their mutual Sharepoint files and demanded to know what agency was auditing them. Mrs. Al-Sawaii explained that she had asked Mr. Isham to run an access report on the Sharepoint files.

61. On or about February 21st or 22nd of 2022, Mrs. Al-Sawaii found that Mr. Isham had started submitting overload payments which was Mrs. Al-Sawaii's job. Mrs. Al-Sawaii's work was already being reassigned throughout the department, despite no demotion or termination as of that time.

62. On or about February 23rd, 2022, Mrs. Al-Sawaii confronted Mr. Isham regarding submitting the overload payments. Mr. Isham became defensive. Mrs. Al-Sawaii submitted a complaint regarding the incident to HR. HR informed Mrs. Al-Sawaii to go to the police department where she was issued a Criminal No Trespass on behalf of UTPB Human Resources. The police department did not know why the university would need to file a Criminal No Trespass against Mrs. Al-Sawaii, and asked Mrs. Al-Sawaii for a copy of her complaints so they could investigate what was going on.

63. On or about February 24th, 2022, Mrs. Al-Sawaii's complaints to HR came back as "Not Substantiated."

64. Sometime in March of 2022, Mrs. Al-Sawaii received emails from CITI bank. Mrs. Al-Sawaii could not access the email. As Mrs. Al-Sawaii had no charges, the statements indicated the credit cards had been canceled by UTPB.

65. On or about March 8th of 2022, Mrs. Al-Sawaii met with Fannin and Kim Campos. Mrs. Al-Sawaii was informed that she was to be terminated, and she was to submit an appeal to inform the college of why their investigation into Mrs. Al-Sawaii's complaints were incorrect. Mrs. Al-Sawaii also received a new updated Criminal no Trespass notice effective March 10th 2022.

66. On or about March 10th 2022, Mrs. Al-Sawaii submitted her appeal letter to UTPB.

67. On or about March 11th, 2022, Mrs. Al-Sawaii received an email stating that she was terminated, and that the police will be at her home in fifteen minutes to collect UTPB's property.

68. On or about March 2022, Mrs. Al-Sawaii received a check with no stub. Suzie explained to Mrs. Al-Sawaii the check is an overtime check. Mrs. Al-Sawaii contacted Mr. Appling via email regarding the check but he did not provide Mrs. Al-Sawaii with a backup stub for the payment.

69. Sometime in April of 2022, Mrs. Al-Sawaii learned that the Criminal No Trespass was updated to Indefinite duration, and was for ALL campus buildings currently. Previously the no trespass was issued for academic buildings only.

70. Mrs. Al-Sawaii submitted her complaint to the EEOC on or about June 2022.

71. Mrs. Al-Sawaii received her right to sue from the EEOC September 20th 2022.

## V.
## CAUSES OF ACTION

72. Plaintiff reiterates and reincorporates all factual allegations above, *en haec verba*.

**A.** ***GENDER & RELIGIOUS* DISCRIMINATION UNDER 42 U.S.C. §2000e-2 *et seq*. OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (as amended)**

73. A claim of intentional discrimination [disparate treatment] may be proved by either direct or circumstantial evidence. See *Wallace v. Methodist Hosp. Sys.* 271 F.3d 212, 219 (5th Cir. 2001). In cases of circumstantial evidence, courts usually follow the burden shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), for indirect discrimination claims. See *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005).

74. To establish a prima facie case of discrimination, a plaintiff must establish she: (1) is a member of a protected class; (2) was qualified for the position at issue; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or other similarly situated persons were treated more favorably. *McCoy*, 492 F.3d at 556; *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

75. In the instant case, Plaintiff is prepared to show that she (1) is a member of the class (female / Muslim) who is intended to be protected by the statute; (2) was qualified for the position at issue, especially given her consistent and continuous history of solid performance and dearth of negative disciplinary history; (3) was subject to adverse employment action, including retaliation via issuance of criminal charges, and her ultimate termination; and (4) was treated less favorably / replaced by someone outside the protected class. *Id.*

B.     **RETALIATION under 42 U.S.C. §2000e-2 et seq. OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (as amended)**

76. Evidence of close proximity between action and response can serve as proof of causation for retaliation claims. See *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001).

77. A *tangible employment action* constitutes "a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision cause a significant change in benefits." *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 118 S.Ct. 2257, 141 L. Ed.2d 633 (1998). Plaintiff submits that removal of work hours, removal of credit hours, issuance of an unsubstantiated criminal trespass, and unsubstantiated termination, among other actions taken as alleged above, are retaliatory.

78. In establishing a Retaliation claim, the Plaintiff must establish that: (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. See *Webb v. Cardiothoracic Surgery Assoc*, 139 F.3d 532, 540 (5th Cir. 1998)

79. The causal link need *not* rise to the level of "but for" causation at the *prima facie* stage. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002) (emphasis added).

80. A three to four month gap can support temporal proximity as the element exhibiting causation. See *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001)(noting that a district court has found a four-month gap sufficient to establish causation). As the Plaintiff noticed the EEOC that, at all times relevant, she was suffering a Continuing Action of Discrimination and Retaliation, in violation of her constitutionally protected rights, she is well within temporal proximity restrictions historically recognized by the Fifth Circuit and the state of Texas, in relation to her protected activity and the adverse employment actions suffered as a result of the Defendant's retaliation against her.

81. To this end, Plaintiff would cite the following, among other actions taken by Defendants, as retaliatory actions taken by the Defendant(s): (i) the removal of work hours to allow her to qualify for her position within the Defendant's employment; (ii) the removal of credit hours to allow her to qualify for her scholastic scholarship; (iii) the removal of credit hours to allow her to achieve her necessary curriculum requirements to meet the credits to graduate with her intended degree; (iv) the issuance of an unsubstantiated criminal trespass on University grounds despite the fact that the Plaintiff and her family lived in on-or-near-campus dormitories; and ultimately (v) the Plaintiff's termination from employment despite internal investigations by the university finding no substance to erroneous allegations of conduct unbecoming leveled against the Plaintiff *after* her complaints to the University of her own adverse and hostile treatment by the Defendants.

C. **HOSTILE WORK ENVIRONMENT**

82. Plaintiff hereby adopts all factual allegations above *in haec verba*.

83. A claim that a Plaintiff has been subjected to a Hostile Work Environment "entails ongoing harassment, based on the Plaintiff's protected characteristics, so sufficiently severe or pervasive that it has altered the conditions of employment an created an abusive working environment." *Bartosh v. Sam Houston State Univ.,* 259 S.W.3d 317, 324 (Tex. App. – Texarkana 2008, pet. denied) (citing *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 Ct. 2399, 2405 (1986)).

84. Plaintiff hereby contends that at all times relevant, all harassment and adverse employment actions, which she continuously received from the Defendant and its managers and officers, was based on her protected characteristics and complaints regarding discrimination and retaliation.  The factual allegations clearly show that this egregious treatment was on-going, and pervasive, throughout the final months of her tenure of employment with Defendant, and was severe in the Dean's entrapment of the

Plaintiff in her own office, and physical intimidation. In order to avoid the issue, the Defendant(s) went so far as to manufacture erroneous claims of inappropriate conduct against the Plaintiff, and erroneously requested campus police issue a notice of criminal trespass to the Plaintiff, without cause.

## VI.
## PRETEXT

85. Where, as here, the plaintiff makes out a *prima facie* case of discrimination, the defendant must articulate a legitimate non-discriminatory reason for the adverse employment decision. *See Baker,* 430 F.3d at 754-55. After the employer does so, "any presumption of [discrimination] drops from the case" and the burden shifts back to the employee to establish that the employer's "stated reason is actually a pretext for [discrimination]." *Baker*, 430 F.3d at 755 (quoting *Septimus*, 399 F.3d at 610-11).

86. An employer's failure to follow its own policies or normal practices may be evidence of pretext. For example, when an employer has a disciplinary system that involves warnings, failure to follow that system may give rise to inferences of pretext. *Goudeau* v. *Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015).

87. By and through the above arguments, Plaintiff's claims shall survive summary judgment.[1]

## VII.
## 42 U.S.C. 1983 As Incorporated in the Civil Rights Act of 1871,
## *In the Alternative*

88. This Complaint, and all discrete sub-parts therein, is *alternatively* brought under the auspices of United States Code chapter 42, section 1983.

89. Plaintiff reiterates all factual allegations *en haec verba*.

---

[1] *See, e.g., Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll*., 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original)

For Section 1983 to come into play, the person/entity to be sued (the defendant) must have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia … ." (42 U.S.C. § 1983.) This shall include any government official acting under color of state law, elected officials, police, social services, or a school district.

90. At all times relevant to the Plaintiff's claims; (i) the Plaintiff was an employee of the state; (ii) the Plaintiff's supervisor(s) were employees of the state; (iii) and all tangible employment actions were either (a) a direct or indirect violation of the Plaintiff's civil rights, or (b) in direct retaliation of her complaints regarding same, conducted by same.

91. This argument is brought in light of the fact that the Defendant(s) herein, acting in their individual capacity, discriminated and retaliated against the Plaintiff, pursuant to the allegations above. Defendant(s) additionally did issue and file a Criminal Trespass against the Plaintiff, without cause, and in retaliation of her protected activity. Defendant's discriminatory and retaliatory actions did adversely impact the Plaintiff resulting in damages to her past, present, and future income, directly and proximately.

**NO QUALIFIED IMMUNITY.**

92. As such, the causes of action herein, including any and all alleged constitutional violations of the civil rights of the Plaintiff, are subsequently barred from qualified or sovereign immunity.[2] Additionally, Plaintiff avers that there was a total dearth of "good faith" by her employer, as any state employee asserting such defense "took the action with the malicious intention to cause a deprivation of constitutional rights or other injury".[3]

---

[2] *Harlow v. Fitzgerald*, (1982) 457 U.S. 800

[3] *Wood v. Strickland*, 420 U. S. 308, 420 U. S. 322

93. The Plaintiff has brought suit against Counts and Beach in their *individual capacity*, and has alleged specific conduct by those individuals which gave rise to constitutional violation(s).[4]

## VIII.
## DAMAGES

94. Plaintiff contends that her steady and continuous pattern of advancement in the workplace was hindered and ultimately destroyed by the Defendants. Plaintiff additionally contends that she did suffer violations of her rights as a result of her constitutionally protected characteristics, and that such adverse employment actions did result in damages to herself which are *en extremis*. As Defendant is believed to employ over five hundred (500) individuals, Plaintiff seeks the statutory maximum under 42 U.S.C. §2000e *et seq*.

95. The Plaintiff had a total dearth of negative disciplinary or performance issues, oddly enough, until she submitted complaints regarding the behavior of the Defendant's employees.

96. The Plaintiff had displayed a steady pattern of exemplary performance in her execution of her duties and responsibilities, and received email confirmation from the Director of Human Resources for the University as late as November 3rd, 2021, that no one at the University had submitted any complaints or grievances regarding the Plaintiff, with regards to either her workplace performance, or her workplace behavior.

97. The damages under Title VII consist of back-pay, front-pay (or reinstatement), compensatory damages, punitive damages, attorney's fees, and costs.

    **Each component is explained below**:

98. **BACK PAY**.  Prevailing claimants under the anti-discrimination laws may recover lost back-pay and benefits.  *See Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013).

---

[4] *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002)

The purpose of back pay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

99. **FRONT PAY**. "Front pay refers to future lost earnings." *Wal-Mart Stores v. Davis*, 979 S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied). Regarding the calculation of front-pay, the Fifth Circuit has stated that "[f]ront pay is . . . calculated from the date of judgment to age 70, or the normal retirement age, and should reflect earnings in mitigation of damages." *Patterson*, 90 F.3d at 936 n. 8 (citing J. Hardin Marion, Legal and Equitable Remedies Under the Age Discrimination in Employment Act, 45 MD.L.REV. 298, 330–334 (1986)). *See also Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir. 1987) ("In calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement.").

100. **COMPENSATORY DAMAGES**. Ms. Al-Sawai has suffered future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, for which she seeks recovery in this lawsuit under Section 1981 and/or Title VII. *See, e.g.*, *Salinas v. O'Neill*, 286 F.3d 827, 833 (5th Cir. 2002) (affirming $150,000.00 compensatory damages award under Section 1981 where the plaintiff did not receive a position because of his race); 42 U.S.C. § 1981A(a)(1) (providing for compensatory damages for such harms under Title VII).

101. **PUNITIVE DAMAGES**. The Defendants intentionally acted with malice and reckless indifference to Ms. Al-Sawai's federally protected civil rights, thus justifying awards of punitive damages under Section 1981 and/or Title VII. *See, e.g.*, *Abner v. Kansas City Southern Railroad Co.*, 513 F.3d 154, 164 (5th Cir. 2008) (affirming $125,000.00

punitive damages awards to each plaintiff under Section 1981, even though each plaintiff was awarded only $1.00 in actual damages, and strongly suggesting that any punitive damages award up to $300,000.00 per plaintiff would have been appropriate even in the absence of any actual damages); *Hampton v. Dillard Dept. Stores*, 18 F. Supp. 2d 1256 (D. Kan. 1998) (awarding the plaintiff $1,100,000 in punitive damages in a Section 1981 race discrimination case); 42 U.S.C. § 1981A(a)(1) (providing for punitive damages under Title VII when the discrimination is shown to be with "malice or reckless indifference"). In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S. Ct. 2118 (1999) the U.S. Supreme Court, interpreting Title VII, held that to satisfy the "malice or reckless indifference" requirement, the plaintiff does not have to prove that the violation was egregious or outrageous. *Id*. at 535-36.

102. All that is required is proof that the employer knew that it was acting in the face of a perceived risk that its actions were in violations of the law's prohibition against discrimination. *Id*.; *see also Schexnayder v. Bonfiglio*, 167 Fed. Appx. 364, 368 (5th Cir. 2006) ("a jury may award punitive damages pursuant to Title VII merely if the employer knew it *may have been* violating the law.") (italics in original).

103. Due to the unlawful discrimination and retaliation engaged in by the Defendant, Ms. Al-Sawai has experienced concrete economic harm in economic damages, as well as emotional distress.

## IX.
## REQUEST FOR JURY

104. Plaintiff demands a trial by jury on all issues.

## X.
## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff Amanda Al-Sawai prays that Defendants UTPB, Dean Beach, and Dean Counts, be cited to appear and answer, and

that on final trial Plaintiff be granted relief as follows:

1.) Judgment against Defendants in excess of the minimum jurisdictional limits of this court in the amount of **$300,000.00** ;
2.) Judgment directing the Defendant to pay Plaintiff actual, compensatory, punitive, and exemplary damages on all counts, whether statutory or at common law;
3.) Costs of suit and court;
4.) Prejudgment and post-judgment interest as provided by law;
5.) Such other and further relief as Plaintiff may be justly entitled by law.

Respectfully Submitted,

*/s/ Julian Frachtman*
Law Office of H. Julian Frachtman
H. Julian Frachtman
TBN 24087536
3100 Richmond, Suite 203
Houston, Texas 77098
tel. 832-499-0611
fax. 713-651-0819
Hfrachtmanlaw@gmail.com
COUNSEL FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

Plaintiff avers that Defendant(s) representatives / registered agent shall be timely and properly served with her *Plaintiff's Original Complaint*, within ninety (90) days from the date of filing this instrument, on or before March 19th, 2023, by CM/ECF e-file service, united states post office regular mail, personal service electronic mail, or certified mail return receipt requested.

UTPB Office of General Counsel
**ATTENTION**: Ana Vieira Ayala
210 West 7th Street
Austin, Texas 78701

CC:   President, Dr. Sandra Woodley
4901 E. University Blvd.
Odessa, Texas 79762

*/s/ H. Julian Frachtman*
H. Julian Frachtman